**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Hyman SCHMIDT, Marvin Gene
Grulke, Chester Folak,
Defendants-Appellants.**

**Nos. 83–3290, 84–1119 and 84–1497.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1984.

Decided April 26, 1985.

---

Dean J. Polales, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Elliot Samuels, Kenneth L. Cunniff, Thomas Corfman, Chicago, for defendants-appellants.

Before ESCHBACH and POSNER, Circuit Judges, and WISDOM, Senior Circuit Judge.*

ESCHBACH, Circuit Judge.

Hyman Schmidt and Chester Folak, former deputies with the Cook County Sheriff's Department, and Marvin Grulke, a self-employed public-auction liquidator, were involved in a multi-faceted scheme to extort money from judgment and tax debtors at the expense of judgment creditors and the State of Illinois. For their parts in the scheme, they were convicted of multiple counts of mail fraud, 18 U.S.C. § 1341, and extortion, 18 U.S.C. § 1951. On appeal, Schmidt challenges the sufficiency of the evidence supporting several of his extortion convictions, and the length of his sentence. Folak challenges the denial of his post-trial motion to withdraw the stipulations upon which the court's findings of guilt were based. Grulke claims that he was promised immunity from prosecution, and that he never should have been indicted. We affirm the convictions.

I.

Defendants Chester Folak and Hyman Schmidt were employed as Cook County Sheriff's Deputies, and were assigned to the Levy Department. The Levy Department is responsible for the enforcement of all seizure warrants and writs of execution directed against delinquent taxpayers and judgment debtors owning property in Cook County, Illinois.[1] As deputies, the defendants were instructed to levy upon the personal property of the debtors pursuant to the writ of execution or seizure warrant. They were required to make proper service of the warrant or writ upon the debtor, inventory the debtor's property and safeguard it pending an auction, post proper notices of public auction of the property, collect the monies owed by the debtor or conduct a public auction of his property, and remit the proceeds to the Sheriff's Office for disbursement in satisfaction of the writ of warrant. The deputies were also responsible for issuing accurate bills of sale for the debtor's property to successful bidders. Defendant Marvin Grulke was self-employed as a liquidator engaged in the business of purchasing assets at public auction for the purpose of resale. Folak and Schmidt, aided by Grulke, did not, however, faithfully execute their duties as Sheriff's Deputies. Instead, they embarked on a scheme to use their positions to line their pockets at the expense of judgment creditors, the State of Illinois, and victimized debtors. The scheme had a number of facets. At times, the defendants rigged auction sales by setting a prearranged price at which the debtor would be allowed to retain his assets. The de-

---

* The Honorable John Minor Wisdom, Senior Circuit Judge for the Fifth Circuit, sitting by designation.

1. A seizure warrant is a command issued by the Illinois Department of Revenue directing the Sheriff to levy upon the property of a delinquent taxpayer to satisfy a tax liability owed to the State of Illinois. A writ of execution is an order entered by the Cook County Circuit Court following a civil lawsuit directing the Sheriff to levy upon the property of a private debtor to satisfy a judgment held by a private creditor.

fendants would then retain a portion of the price, fail to conduct a public auction, and arrange for the return of the debtor's assets to the debtor. At times, the defendants looted assets seized from debtors while these assets were in the defendants' care and custody. Defendants sometimes accepted money or other property for their own use in order to allow a debtor to continue to operate his business.

Defendants were charged in a 47-count indictment with violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1951 (extortion). Before trial, defendant Grulke moved to suppress statements and evidence against him, arguing that he had cooperated with the government in reliance on the prosecutor's promises of immunity. A hearing on the motion to suppress was held before a magistrate, and the district court substantially adopted the magistrate's findings that the prosecutors had not at any time offered Grulke immunity, nor had they given Grulke any reason to believe that he would be immunized in return for his cooperation. The case was then heard by the district court judge. All of the evidence, including the government's exhibits, was stipulated to by the government and the defendants.[2]

Grulke, who was charged in 15 counts of the indictment, was found guilty of three counts of mail fraud and three counts of extortion[3] and acquitted of nine other counts. Folak was found guilty on nineteen counts of mail fraud and nine counts of extortion and acquitted of eleven other counts. Schmidt was found guilty on three counts of mail fraud and five counts of extortion and acquitted of eleven other counts.[4]

## II.

### A.

Hyman Schmidt contends that the evidence was insufficient to support his convictions on Counts 22, 25, and 36 for extortion. He also argues that the district court abused its discretion in sentencing him to serve seven years in prison. We examine each contention in turn.

### 1. Extortion Convictions

■ Relying on *United States v. Addonizio*, 451 F.2d 49 (3d Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), Schmidt argues that the conduct described in the stipulations, concerning Counts 25 and 36 constitutes, at most, bribery and not extortion. According to Schmidt,

> while bribery [is] a voluntary payment made in order to exert undue influence upon the performance of an official duty, extortion involves payment in return for something *to which the payor is already legally entitled.*

*Id.* at 72 (quoting *Hornstein v. Paramount Pictures*, 22 Misc.2d 966, 37 N.Y. S.2d 404 (1942)) (emphasis in original). Since the debtors involved in these counts were not legally entitled to the benefits they received, Schmidt reasons, the conduct described cannot be extortion.

It is unclear from the *Addonizio* opinion whether the court accepted the distinction pressed by Schmidt here,[5] *see id.* at 73. It is absolutely clear, however, that this court

---

**2.** The court granted the government's motion to dismiss paragraph 12 of Count One, and Counts Twelve and Thirty-two, for lack of evidence.

**3.** Grulke at times impersonated a deputy sheriff in order to carry out the extortionate scheme.

**4.** The defendants received the following sentences:

Schmidt—7 years in prison and $7,000 fine;
Folak—17 years in prison and $17,000 fine;
Grulke—5 years in prison and $5,000 fine.

**5.** The quotation from *Addonizio* reproduced above upon which defendant relies occurred in the context of an historical discussion. The

*Addonizio* court explained that the definition of extortion in 18 U.S.C. § 1951 had its genesis in the New York Penal Code.

Judge Aldisert, dissenting in *United States v. Cerilli*, 603 F.2d 415, 426 (3d Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), argued that extortion under color of official right as defined in 18 U.S.C. § 1951 must be construed as narrowly as extortion under the New York Penal Code. His view did not gain acceptance in the Third Circuit, nor any other circuit.

has repeatedly rejected it. *See, e.g., United States v. Hedman*, 630 F.2d 1184 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Price*, 617 F.2d 455, 457 (7th Cir.1979); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

▇ Schmidt next argues that his convictions for extortion in Counts 25 and 36 must be reversed because there is no evidence that he coerced or induced the payments that he received; he argues, in effect, that the payments were merely gratuities. Schmidt relies heavily on *United States v. O'Grady*, 742 F.2d 682, 692–93 (2d Cir.1984) (en banc), in which the court found erroneous a jury instruction on extortion that "omitted an essential element of the offense, *to wit*, a finding that [the defendant] misused his office to obtain benefits not due him ...." The court explained that

> to prove the crime of extortion under color of public office the government must show that the public official *induced* the benefits received. The fact of public office supplies the potential threat or force necessary, but it is the wrongful use of that office to induce benefits that constitutes the crime.

*Id.* at 688 (footnote omitted; emphasis in original). While the *O'Grady* court would not require the government to "prove that the public official demanded or directly solicited the benefits received, or that he offered a specific *quid pro quo*," it would require that the government "show that the power of public office was misused in such a way as to induce the giving of benefits." *Id.* at 688–89. The court recognized that several other courts of appeals including this one, *see e.g., United States v. Hedman*, 630 F.2d 1184, 1195 (7th Cir.

1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981), had specifically rejected the notion that proof of inducement by the public official is necessary. Nevertheless, the court "[did] not read those decisions to permit a conviction for extortion under color of official right absent evidence that the public official had misused his office to obtain the benefits." *O'Grady*, 742 F.2d at 689.

Our prior cases clearly hold that

> [i]t is settled law in this Circuit ... that in a ... prosecution for extortion under color of official right it is unnecessary to show that the defendant induced the extortionate payment .... The government is merely required to prove that a public official obtained money to which he was not entitled and which he obtained only because of his official position.

*Hedman, supra,* 630 F.2d at 1195. *See also United States v. Braasch*, 505 F.2d 139, 151 n. 8 (7th Cir.1974) ("coercive" extortion not only type outlawed by 18 U.S.C. § 1951; also illegal to accept payoffs "under color of official right," and that offense does not require proof of coercion), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

However, we need not disagree with *O'Grady*'s holding that some "misuse" of office is required in order to affirm Schmidt's convictions for extortion. The evidence under Count 25 shows that Schmidt accepted money from a tavern owner on three occasions and, in return, allowed the tavern to remain open instead of closing it and executing a writ of execution. The district court could have found from evidence that Schmidt twice returned to the tavern to collect additional payments, that Schmidt solicited the payments he received.[6] The evidence under Count 36

---

6. We note that even the *O'Grady* court realized that

> inducement can take many forms, some more subtle than others. Proof of a request, demand or solicitation, no matter how subtle, will establish wrongful use of public office; proof of a *quid pro quo* would suffice as

would other circumstantial evidence tending to show that the public official induced the benefits. If the evidence established that [the defendant] clearly created the impression, not by words but by deeds [that gifts were required for favorable treatment he] could not escape conviction.

shows that Folak suggested to the owner of an automobile parts company upon whom he had served a seizure warrant that he would allow the owner to buy back the business for a payment to Folak, Schmidt, and a third person. The owner paid Schmidt $500, and no auction was ever held. The evidence was more than sufficient to show that Schmidt did not passively accept a "gratuity," but, along with Folak, actively solicited an illegal payment.[7]

■ Schmidt also claims that the evidence of extortion under Count 22 is insufficient, contending that there is no evidence that he obtained payments wrongfully. Schmidt argues that the evidence only shows that he collected money in the course of his employment to satisfy a writ of execution. The defendant apparently overlooks the fact that, as a reviewing court, we must assess the evidence in the light most favorable to the government. That evidence shows that Schmidt visited the premises of B & L Beauty Supplies on July 7, 1979, in connection with several seizure warrants. Schmidt told B & L's owner, Robert Hayes, that he would close the business unless Hayes "came up with some cash." Hayes gave Schmidt approximately $100 so that Schmidt would leave B & L open. Schmidt paid two more visits to B & L, and was given $100 each time. When Schmidt returned on September 18, however, Hayes had no more money. Schmidt called a liquidator, who arranged to have B & L's locks changed, and told Hayes he could buy back B & L if he brought $500 to the liquidator the next day. Hayes borrowed the money from an employee and delivered it to the liquidator, who issued a bill of sale in the employee's name. Schmidt reported to the Sheriff's Department a sale of B & L's assets at public auction on September 18, 1979, to Ace Auctioneers for $300.

Schmidt claims that since the amount he received from Hayes over the course of the summer equals the amount he remitted to the Sheriff's Department, no inference can be drawn that he collected any money unlawfully. However, Schmidt simply ignores a stipulation that "[n]one of the approximately $300 [collected over the summer] was remitted to the Sheriff's Department by Schmidt." The trier of fact could easily have found that Schmidt obtained the $300 he eventually remitted to the Sheriff from the liquidator, and that he took and retained the other $300 as payment for allowing Hayes to keep his business open. The evidence is sufficient to support Schmidt's conviction.

## 2. Sentencing

■ Schmidt, who was 71 years old at the time of sentencing, complains that his seven-year prison sentence is too harsh. Schmidt's sentence is well within statutory limits,[8] and our review of such a sentence is extremely circumscribed. We may not reduce or change a sentence imposed within statutory limits "unless the trial court relied on improper or unreliable information in exercising its discretion or failed to exercise any discretion at all in imposing the sentence." *United States v. Ely*, 719 F.2d 902, 906 (7th Cir.1983) (quoting *United States v. Fleming*, 671 F.2d 1002, 1003 (7th Cir.1982)), *cert. denied,* —— U.S. ——, 104 S.Ct. 1313, 79 L.Ed.2d 710 (1984).

■ Schmidt claims that the court sentenced him to a substantial period of incarceration in order to send a message to Schmidt's unindicted superiors at the Sheriff's Department. The record does not support this assertion. The government attorney, indeed, stated that a substantial sentence was justified partly by the need to

---

742 F.2d at 691–92.

7. Schmidt argues that the evidence of inducement is also insufficient in Count 22. As in Count 25, the evidence shows repeated visits by Schmidt to the debtor, and repeated acceptance of money to leave the business open.

8. At oral argument, Schmidt's attorney informed us that under the statutes, Schmidt could have been sentenced to a maximum of 115 years imprisonment. We also note that because of his age, Schmidt was sentenced under the provisions of 18 U.S.C. § 4205(b)(1), and therefore becomes eligible for parole after serving two years and 120 days.

deter similar conduct by other officials. Judge McMillen said nothing about sending a message to higher-ups; rather, he stated that the sentence was justified because the defendant was guilty of "very serious crimes that undermine the integrity of not only [Schmidt's] office but of the judicial system that has to enforce these various writs." Nor can we agree with Schmidt that the judge failed to consider any of the various mitigating factors present (such as Schmidt's age, military service, and lack of a previous criminal record). The judge did consider these factors explicitly, on the record, but expressly determined that they were outweighed by the aggravated nature of the offenses. None of the other complaints Schmidt raises about the sentencing process has merit. Accordingly, we find that the district court did not abuse its discretion in sentencing Schmidt to seven years imprisonment.

### B.

■■■ As noted in Part I, *supra*, the defendants submitted the case to the district court for decision solely on the basis of extensive stipulations of fact. Folak was charged in 39 counts of the indictment and convicted on 28. He now argues that the district court erred in denying his post-trial motion to withdraw the stipulations. While conceding that Fed.R.Crim.P. 11 does not apply, Folak contends that the stipulations were the functional equivalents of guilty pleas, and that the district court should therefore not have accepted them without conducting an inquiry substantially similar to that required by Rule 11.[9]

We have difficulty accepting Folak's argument for several reasons. First, the factual predicate for Folak's argument (that is, that the stipulations amounted to guilty pleas) is doubtful. The stipulations were simple narratives, and largely testimonial. They stated facts to which the govern-

ment's witnesses would have testified had they been called, with no stipulation as to the truthfulness of the testimony. There were no stipulations as to intent. The district court was merely asked to decide the case on the basis of an agreed statement of facts; the legal inferences remained to be drawn. Defendant was, in fact, acquitted of eleven of the counts against him.

Moreover, almost every federal court that has considered the argument advanced here by Folak has rejected it outright. *See, e.g., United States v. Robertson*, 698 F.2d 703, 709 (5th Cir.1983) and cases cited therein. The District of Columbia Circuit would apparently require Rule 11 inquiries if "by stipulation or otherwise a defendant has effectively admitted his guilt and waived trial on all issues." *United States v. Lawson*, 682 F.2d 1012, 1015 (D.C.Cir. 1982); *United States v. Strother*, 578 F.2d 397 (D.C.Cir.1978). As demonstrated above, however, this is not such a case. *Cf. Lawson, supra.*

■■■ The defendant counters, however, that in agreeing to submission of the case on the basis of stipulations, he waived several constitutional rights, and he contends that we should not accept such a waiver on the basis of a silent record. Folak admits, as he must, that the record is not entirely silent. Folak acknowledged, in open court, his signature on a jury waiver form. The following colloquy ensued:

The Court: So, you are giving up your constitutional right to a trial by jury by submitting this case on stipulations, is that correct?

Defendant Folak: Yes, sir.

\* \* \* \* \* \*

The Court: Are you satisfied with [your attorney's] recommendation and representation of you in this case?

Defendant Folak: Yes, sir.

---

9. The government argues that the merits of Folak's post-trial motion to withdraw the stipulations are not properly before us, contending that the motion was an untimely motion under Fed.R.Crim.P. 33. We note that there was no impediment to the district court's jurisdiction to consider the motion, as the motion could properly be considered under 28 U.S.C. § 2255. *See, e.g., United States v. Brown*, 413 F.2d 878 (9th Cir.1969), *cert. denied*, 397 U.S. 947, 90 S.Ct. 965, 25 L.Ed.2d 127 (1970).

The Court: So all of you defendants have now decided to let the case be decided without a jury and *on the basis of the stipulation that has been entered into,* is that correct?

\* \* \* \* \* \*

Defendant Folak: Yes.

Transcript, Feb. 28, 1983, pp. 3–4 (emphasis added).

While defendant vigorously contends that he was never told there would be no trial, that he would not confront witnesses, and that he would not be given the opportunity to present evidence on his own behalf, the clear implication of Folak's answers to the court is that he knew that the stipulations would constitute the entire evidence in the case. Moreover, Folak was a deputy sheriff, and we may assume that he therefore had some familiarity with the judicial process. Defendant's protestations that he was misled by his attorney as to the import of the stipulations, and the rights he was waiving, strain credibility. Folak stated in open court that he was satisfied with his attorney's recommendations, and did not express his surprise that there was to be no formal trial until months after the decision in his case. Finally, we note, as did the court in *Robertson, supra,* 698 F.2d at 708, that there is less reason to suspect the voluntariness of various waivers of trial rights in the context of a not guilty plea, than where the defendant has actually entered a plea of guilty because there is no reason to suspect that the plea has resulted from coercion or cajolery by the prosecution. We therefore reject Folak's argument that the district court was required to conduct a more extensive inquiry in this case, and we affirm the denial of Folak's motion to withdraw the stipulations.

### C.

Grulke moved before trial to dismiss the indictment on the ground that he had been promised immunity from prosecution in exchange for his cooperation in the investigation leading to the indictment. The government contested Grulke's claim, and the district court referred the matter to a magistrate for a hearing. The magistrate concluded that there was no credible evidence that Grulke had been given either an express or an implied promise that he would not be prosecuted. Grulke filed exceptions to the magistrate's report, and the district court overruled the objections.

The defendant first contends that the finding that no promises of immunity were made is clearly erroneous. We disagree. Defendant relies on a letter from an Assistant United States Attorney to defendant's counsel which stated that on at least one occasion after March 16, 1981, defendant was told by an FBI agent that "if he told the truth and fully cooperated with the investigation he would not get into any trouble." Defendant characterizes this letter as uncontradicted evidence that he was promised immunity. Defendant ignores the tremendous amount of evidence, credited by the magistrate and the district court, that he was told by the same agent before March 13 that no one but the United States Attorney could promise him immunity, and was also told specifically that neither the FBI nor its agents had the authority to determine who would be subject to prosecution. Further, at a meeting on March 13 between Grulke, the FBI agent, and Assistant United States Attorney Stetler, Grulke was told by Stetler that the U.S. Attorney would make no promises or commitments, and that if charges were brought against him and he were convicted, the court would be informed of his cooperation at the time of sentencing. Even Grulke admitted that he was told at this meeting that he could not be given immunity (although he testified he was told that he would not be prosecuted "from this day forward" if he cooperated). The district court's finding that Grulke was not promised immunity is not clearly erroneous.[10]

Both the magistrate and the district court concluded further that any reliance

---

**10.** The district court expressly adopted the following findings of the magistrate:

1. That the FBI Agent's testimony that he gave Grulke no promise of immunity was corroborated;

on statements made by the FBI agent was unreasonable in light of the repeated admonitions by both the agent and the government attorney that only the U.S. Attorney could grant immunity. Grulke invites us to infer from the extent of his cooperation that he must have relied on some sort of promise. We decline this invitation to reweigh the evidence before the magistrate, especially in light of the magistrate's credibility determinations against Grulke.[11]

Finally, Grulke argues that the statements of the FBI agent and the Assistant United States Attorney created "confusion" over Grulke's legal status, and that this confusion was sufficient to warrant dismissal of the indictment. We disagree. The magistrate found that Grulke knew and understood that only the United States Attorney could promise him immunity. Thus, no statement by the FBI agent could have been perceived by defendant as a promise of immunity. Moreover, the magistrate specifically found that Grulke's testimony that he was told by the Assistant United States Attorney on March 13 that he would not be prosecuted "from this day foward" was unbelievable. Again, Grulke's argument amounts to an invitation to ignore the credibility findings made below. This we decline to do. *See United States v. Weiss,* 599 F.2d 730 (5th Cir.1979).

Grulke's motion to dismiss the indictment was properly denied.

### III.

For the reasons stated above, the judgments of conviction are affirmed.

2. That no reasonable basis existed for the defendant's purported reliance on the agent's statements for believing that he had been promised immunity;
3. That no promise of immunity was given by government prosecutors.
The district court did not adopt the magistrate's finding that no credible evidence existed that any express or implied promise was given defendant; however, in the decision overruling defendant's exceptions to the magistrate's report, the judge noted that the report was premised on the finding that no credible evidence of promises exists. It is evident from the decision that the judge accepted this finding as the factual predicate for the rest of the magistrate's find-

ings and recommendations, and believed that it was supported by substantial evidence.

11. Grulke contends that the government failed to deny his reliance on promises in its "pleadings," and therefore his reliance should be deemed admitted. There were no pleadings. Grulke filed a motion to dismiss the indictment and the government responded to the motion, joining Grulke's request for a hearing. The government was not required to deny all the allegations made by Grulke in his motion. The government's response to a defendant's pre-trial motion is not the equivalent of an answer to a complaint in a civil action.