**Albert EPSOM, Petitioner, Appellant,**

v.

**Timothy HALL, Respondent, Appellee.**

No. 02–2222.

United States Court of Appeals, First Circuit.

Heard April 9, 2003.

Decided May 29, 2003.

Robert L. Sheketoff, for petitioner.

James J. Arguin, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief for respondent.

Before BOUDIN, Chief Judge, LYNCH and HOWARD, Circuit Judges.

BOUDIN, Chief Judge.

In this habeas proceeding, 28 U.S.C. § 2254 (2000), Albert Epsom challenges his state conviction for first degree murder. The issue is whether his trial counsel rendered ineffective assistance. The district court denied relief but granted a certificate of appealability, 28 U.S.C. § 2253 (2000). We accept the framework for analysis ably constructed by Epsom's counsel in this court but conclude that relief was properly denied.

The factual background is critically important. In the early morning hours of March 19, 1983, up to fifteen members of the Centaurs motorcycle club were present in a bar in Waltham, Massachusetts. They were large men—some weighing two hundred pounds or more—dressed in black leather vests, some wearing wristbands with spikes and one bearing a hunting knife case on his belt. Epsom entered with another man (Thomas Hutton) and three women. A quarrel ensued between Epsom and a member of the bar staff, leading in turn to an exchange of epithets between Epsom and one of the Centaurs, Robert Ferrazzani.

Ferrazzani then charged Epsom, tripped, and ended up on the floor with Epsom holding him down. Epsom was then hit with a bottle and Hutton was punched by several of the Centaurs. Epsom released Ferrazzani, made a placatory comment, and left to curses by Ferrazzani. Epsom was followed outside by four of the Centaurs, one of whom was James Wilson. What then happened was described by the Supreme Judicial Court ("SJC") as follows:

> Outside, there were several people on the sidewalk including four to six Centaurs. Hutton told his female companions to get into their nearby car. [Epsom] spun around and picked up a firearm that had fallen from his person to the ground. He placed the gun in his belt, raised both hands, and said, "It's away, it's away," or "It's back in my holster." One of the Centaurs told [Epsom] that none of them had guns, that none of them wanted trouble, and that they just wanted to go home. Other Centaurs were yelling at [Epsom] and Hutton.

> Then, [Epsom] pulled his gun from his belt, stated "I don't care if there's twenty of you; I'm not afraid of nobody," waved the gun back and forth, and fired a shot into the sidewalk. After the shot, the victim [James Wilson] said "[G]et the fuck out of here." [Epsom] then said, "[F]uck you," and shot the victim in the arm. [Epsom] turned to his left, kicked one of the Centaurs in the groin, and then turned back to his right and shot the victim again. He shot the victim a third time. The fatal shot entered the victim's chest.

*Commonwealth v. Epsom*, 399 Mass. 254, 503 N.E.2d 954, 956–57 (1987) ("*Epsom I*"). Epsom does not dispute this summary of the record but claims that the evidence would have been different if competent counsel had called other witnesses.

At trial, Epsom's counsel defended on the ground that Epsom had acted in self-defense. Largely through cross-examination of state witnesses, counsel established that the Centaurs were a menacing crew, that Ferrazzani had started the fight inside the bar, that the Centaurs had there assaulted Epsom and Hutton, that Epsom had sought to leave peacefully, that several Centaurs had followed shouting abuse, that outside Epsom had been alone confronting as many as ten persons, and that he had fired a warning shot before shooting Wilson.

Somewhat reluctantly, the trial judge gave a jury instruction on self-defense. Epsom was convicted of first degree murder and sentenced to life imprisonment. On direct appeal, Epsom argued that the self-defense instruction was erroneous. The SJC denied the claim, saying that Epsom's evidence did not permit a self-defense theory: "There was no evidence that [Epsom] was assaulted or threatened *outside the pub*, or that the entire series of events, including those within the pub, caused [Epsom] to be without reasonable means of escape and to be actually and reasonably in fear of grievous bodily harm or death when he shot the victim." *Epsom I*, 503 N.E.2d at 957 (emphasis added).

In 1994, pursuant to Massachusetts' procedure for post-conviction relief, Epsom moved for a new trial and for appointed counsel. The motion was based on alleged ineffective assistance related to the failure to call Epsom himself and Gina Carver as witnesses; and the affidavit attached to the *pro se* motion also referred to the failure to call Hope Nevins. Epsom was initially unsuccessful but eventually the SJC remanded the case for an evidentiary hearing in Superior Court, *Commonwealth v. Epsom*, 422 Mass. 1002, 661 N.E.2d 1337 (1996) ("*Epsom II*"), where two potential witnesses, Carver and Nevins, testified.

Carver testified at the evidentiary hearing that she saw the motorcyclists advance toward Epsom before any shots were fired. As for Nevins, she had said in a 1983 police statement that she saw Epsom punched as events progressed outside the bar and added at the evidentiary hearing that she heard a threat and saw a few of the Centaurs go toward him. Epsom also testified at the hearing but not as to what he would have said if he had testified at trial. Still, the statements of Carver and Nevins, if unimpeached, would have helped support the inference that Epsom was under threat outside the bar.

After the hearing, the judge determined that Carver had not been available to testify at the time of the trial. Alternatively, the judge held that failing to call Carver as a witness did not amount to ineffective assistance because she could not see clearly from her vantage point and her credibility was suspect.[1] The hearing judge did not reach the testimony of Nevins, holding that it was beyond the scope of the SJC's remand. A single justice of the SJC affirmed, adding that even if Carver's testimony were admitted, it would not show self-defense under Massachusetts law. Epsom then filed the present federal habeas action.

The district court denied Epsom relief. It agreed with the state court that Epsom made a "knowing and voluntary decision not to testify on his [own] behalf after consultation with counsel." It deferred to the state court's fact findings with respect to Carver and concluded that failing to call her was not constitutional error. As to Nevins, the district court held that failure

to call her could not have affected the outcome of the trial because her proposed testimony contradicted her prior statement to the police, *see* note 1, above, and because, in any event, she did not see Epsom being confronted with any weapon and no case for a self-defense theory could be made on these facts.

■ We review the district court's decision in this case *de novo*. *Stephens v. Hall*, 294 F.3d 210, 217 (1st Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 907, 154 L.Ed.2d 816 (2003). Under section 2254, habeas relief is available only if the state court's decision, on any issue it actually decided, *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir.2001), *cert. denied*, 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002), "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). State court fact findings are "presumed to be correct," unless a habeas petitioner can rebut with "clear and convincing evidence" to the contrary. *Id.* § 2254(e)(1).

At the threshold, Massachusetts argues that Epsom's claim with respect to Nevins is unexhausted; but Epsom relied on Nevins in his original *pro se* motion for a new trial and—although Nevins' possible testimony was not addressed by either the Superior Court or the SJC—the district court agreed with Epsom that exhaustion had occurred. Indeed, the district court held that because the state courts had bypassed the claim, review as to Nevins should be without deference to the state

---

1. At the hearing, Carver admitted that her perception on the night in question was impaired by alcohol and drugs such that she was "high as a kite." She was Epsom's girlfriend at the time of the crime, afterwards fled with him out of state, and had a lengthy record of prior arrests and aliases. In a police state-

ment given by Nevins to the police in April 1983, Nevins said that Carver had told her that "she did not see the shooting." In the statement, Nevins also said that she herself could not see Epsom during the altercation outside the bar.

courts. *Fortini,* 257 F.3d at 47. On appeal, the state renews its exhaustion objection but we accept the district court's contrary view.

Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), relief on Epsom's claim of incompetent counsel requires two elements: first, trial counsel's performance must be deficient in some way sufficiently substantial to deny him effective representation; and second, that deficiency must have resulted in prejudice, defined as a "reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Id.* at 687, 694, 104 S.Ct. 2052. Epsom's argument is that trial counsel failed the *Strickland* standard by failing to call three critical witnesses to support a theory of self-defense: Epsom, Carver and Nevins.

Epsom's habeas counsel does not deny that each of the witnesses was vulnerable and that, assuming a substantial case of self-defense had otherwise been presented, a reasonable tactical decision could be reached to refrain from calling Epsom, Carver and Nevins. But, precisely because the case actually presented was very weak—indeed, the SJC suggested that no self-defense instruction was even justified, *Epsom I,* 503 N.E.2d at 957—Epsom's habeas counsel says that trial counsel *had* to call the weak witnesses available to him to have any chance of success. Failing to do so would amount to abandoning the only defense available. In his brief, habeas counsel argued thus:

> The basketball player with the ball, who decides that he can't pass because no one's really open, that he can't dribble because the defender knows he only goes right, and that he can't shoot because he's out of his best range, guarantees that his team will not score. The trial attorney here made the same outcome determinative series of calculations.

Often, a weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments and focusing attention on weaknesses. *See, e.g., United States v. Moran,* 312 F.3d 480, 490 (1st Cir.2002); *Lema v. United States,* 987 F.2d 48, 54 (1st Cir.1993). But we accept counsel's assertion on this appeal that weak witnesses in an otherwise hopeless case are better than none. For this reason, in such a case the failure to call weak witnesses cannot be justified merely by pointing to the potential weaknesses of each individual witness.

■ It is also true that in this instance Epsom's original defense was *relatively* weak: Massachusetts law on self-defense has a decidedly pacifist tone compared to many other states and strongly encourages retreat.[2] It was certainly a gamble to withhold any witness who *might* strengthen the case, since the trial judge might in the end have refused to give the self-defense instruction. Epsom's claim of incompetence at first seems to have strength because the SJC later ruled that a jury instruction on self-defense should never have been given at all.

This is too narrow a perspective. Trial judges, as Epsom's counsel surely recognized, would be likely to bend over back-

---

**2.** *Compare Commonwealth v. Roberts,* 433 Mass. 45, 740 N.E.2d 176, 184 (2000) (duty to retreat before use of deadly force in defense); *Commonwealth v. Curtis,* 417 Mass. 619, 632 N.E.2d 821, 830 & n. 11 (1994) (excessive force not mitigated if duty to retreat not satis-fied and citing *Epsom I* ); *Fortini,* 257 F.3d at 49 & n. 7; *with* LaFave & Scott, 1 *Substantive Criminal Law* § 5.7(f), at 659–60 & n. 62 (1986) (describing the majority of American jurisdictions as not requiring retreat and citing cases).

wards to give Epsom the benefit of the doubt at the instruction stage, especially where self-defense was asserted in a first degree murder case. *See, e.g., Commonwealth v. Toon,* 55 Mass.App.Ct. 642, 773 N.E.2d 993, 998 (2002). That the SJC said later that the instruction should not have been given shows how great was the gamble. But the trial judge *did* allow the defense, and so—whether *post hoc* events are to be considered in assessing antecedent reasonableness (a debatable view)—the immediate gamble paid off. Indeed, if the jury had acquitted, the SJC would never have had the opportunity to disagree.

■ So Epsom's trial counsel had a plausible strategy and the real underlying question is whether his case would have been strengthened or weakened by calling any of the three additional witnesses *and* by how much. The "how much" bears on both halves of the *Strickland* standard. Trial lawyers make countless tactical choices and unless the net reckoning is "patently unreasonable," counsel's judgment is not constitutionally defective. *Phoenix v. Matesanz,* 233 F.3d 77, 82 n. 2 (1st Cir.2000). Further, even a badly flawed judgment is not enough: to show prejudice, the likelihood of a different result must be reasonably high. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

At trial Epsom's counsel established, largely through cross examination but also through direct evidence from a few bystanders at the bar, that Epsom was not the aggressor in the bar fight, that Ferrazzani had charged him and that other bikers had used fists and bottles in the bar, that Epsom had tried to leave the bar peacefully, that Epsom was alone outside the bar confronting as many as ten Centaurs or other patrons, that some of the Centaurs may have been armed, that a man came in Epsom's direction with a two-by-four board, and that Epsom fired a warning shot before shooting Wilson.

This is the baseline against which the value of other evidence must be judged.

What then could Carver and Nevins have contributed and to what effect? Taken at its best, their testimony would have been that, outside the bar, the bikers advanced on Epsom; and that, according to Nevins, Epsom was punched. Both witnesses could have been impeached on one or more grounds—inconsistency, bias in favor of Epsom, and impaired perception, *see* note 1, above—but this is hardly a complete answer. If (especially taken together) they were both available and would have supplied some critical piece of evidence in Epsom's favor, or negated the critical evidence against him, one might ask why they were not used despite the attendant limitations and risks.

■ However, under Massachusetts law, the defendant no matter how provoked or put in fear is effectively required to retreat before the use of deadly force if he can do so with safety. *Roberts,* 740 N.E.2d at 184. Habeas counsel suggested that Epsom might be entitled to a verdict of manslaughter if physically threatened, but under Massachusetts law no such reduction in the offense is available if the duty to retreat is not satisfied. *Curtis,* 632 N.E.2d at 830 & n. 11; *see also Commonwealth v. Niemic,* 427 Mass. 718, 696 N.E.2d 117, 121 & n. 2 (1998). The state's evidence as to the end game is summed up in the final SJC paragraph quoted above: the victim did not back away but he did tell Epsom to do so—which is why the SJC disparaged the giving of any self-defense instruction.

This did not make the defense hopeless. Cases are not tried to appellate courts. The evidence at trial showed that the Centaurs were a dangerous lot, had started the fight, and had pursued Epsom outside the bar when he sought to disengage. The jurors might have asked themselves how they would have reacted in Epsom's posi-

tion and worried somewhat more than did the SJC about how easily Epsom might have retreated from a hostile crowd. And Wilson, who had hit Epsom with a bottle in the bar, was an unsympathetic victim.

■ But whether an opportunity to retreat existed did not depend fundamentally on details that might have been added by Carver and Nevins. There was no doubt that Epsom had been threatened: the question was why he did not retreat. As to the degree of threat, Carver and Nevins' testimony might have helped somewhat as to the risk of retreat or it might have diverted attention toward their doubtful credibility. In all events, this was just the kind of close call counsel is entitled to make, *see Lema*, 987 F.2d at 54, and the failure to offer these witnesses is most unlikely to have altered the outcome.

■ This brings us to the failure to call Epsom himself. The district judge deemed this claim of ineffective assistance to be answered by the finding that Epsom had validly waived his right to testify after consulting with counsel, but whether there was a procedurally proper waiver is beside the point. *See generally Siciliano v. Vose*, 834 F.2d 29, 30–31 (1st Cir.1987). Certainly, Epsom could not complain if counsel urged him to testify and Epsom refused; but if counsel mistakenly urged Epsom not to testify and Epsom took the advice, there could be a valid waiver of the right to testify but counsel might still be ineffective.

■ In all events, even if counsel told Epsom not to testify, the outcome would be the same on this appeal. Epsom's brief on appeal claims (without detail) only that he would have testified that "he acted in self defense after being threatened outside the bar." This of course is no answer to the duty to retreat. There is no indication that he would contradict the damning evidence that, after the victim told him to leave, he instead shot the victim three times, once apparently while the victim was already lying on the ground. Trying to explain all this on the witness stand could easily have left Epsom even worse off.

Further, had Epsom testified, apparently he risked impeachment based on his prior conviction for a violent crime involving the use of a dangerous weapon. Such evidence might be barred in a federal trial because propensity evidence is highly restricted, Fed.R.Evid. 404(a), and Epsom's prior crime was not one that impugned his veracity, Fed.R.Evid. 609. Massachusetts law, however, is more friendly to impeachment by prior crimes. Mass. Gen. Laws ch. 233, § 21 (2000); *Commonwealth v. Paulding*, 438 Mass. 1, 777 N.E.2d 135, 143–44 (2002). Had the jury learned of such a conviction, it would have undercut both any claim that Epsom had fired in fear and any residual sympathy for him as a law-abiding man trapped in bad circumstances. Once again, defense counsel's decision was not incompetent nor did it likely alter the outcome.

*Affirmed.*